Ashhurst *v.* Potter.

Ashhurst and others, complainants, .

*v.*

Potter and others, defendants.

A testator gave his estate to his executors, in trust, to pay an annuity to his widow for life, the remainder to be divided into equal shares, those of the sons to be paid to them upon their respectively attaining their majority, and those of the daughters to be kept invested, the interest to be paid to them during their lives and the remainder to their children. There were two sons and two daughters. The sons' shares were paid (after reserving a fund sufficient to yield the annuity), not in money, but by transferring to them one-half in value of the remaining securities of the estate. Afterwards the amount of the estate was increased by a rise in the value of the securities and by stock dividends thereon, and another similar transfer of securities was made to the sons on account of their proportionate shares of such increase. At the time of the last payment, however, a *devastavit* by the trustee existed.—*Held,*

(1) That the equality of the sons' shares was referable to the time when each could claim the payment thereof, and, hence, each was entitled to one-fourth of the estate as it stood when he became of age.

(2) That the transfer of the securities to the sons was equivalent to an actual payment of each son's share.

(3) That the sons must account for and refund a proportionate part of the securities transferred for the second payment, according to their present value, sufficient to make good the *devastavit.*

(4) That the sons having received the second payment *bona fide* and under a mistake, are not liable for interest thereon.

(5) That the bill is one to ascertain the trustee's management of the estate, and to recover the part wasted, constitutes no formal objection to the sons' accounting in this suit, they being defendants and interested in the adjustment and settlement of the estate.

On appeal from a decree of the chancellor, on exceptions to a master's report. The opinion below is reported in *Ashhurst* v. *Field,* 11 *C. E. Gr.* 1.; see, also, *S. C.,* 1 *Stew.* 315.

Mr. *Elmer E. Green* and *Mr. E. Spencer Miller,* for complainants.

Mr. *Northrop* and *Mr. C. Parker,* for defendants.

The report of Barker Gummere, Esq., as master, on exceptions to which the chancellor's opinion was rendered, is as. follows:

Thomas F. Potter, domiciled in New Jersey, died in 1853, having first made his will, which was proved in New Jersey by Richard S. Field, James Potter and others, the executors thereof. By the will, the testator devised all his lands to his widow for life, and after her death to his son John, and gave to his widow an annuity of $6,000 during her life. He also gave $50,000 to a son James, who died during the testator's life-time. He then gave all the residue of his estate, real and personal, to his executors, in trust, for the use of his children, John, William H., Elizabeth, Alice, and James, to be equally divided between them, share and share alike, the shares of the sons to be paid to them as they severally arrived at age; the interest of the respective shares of the daughters to be paid to them yearly during their lives, and upon their deaths their shares to be divided equally among their respective children, but if either should die without issue, her share to go to her surviving brothers and sisters, equally to be divided between them. The executors were empowered to sell the real estate not specifically devised, and any part of the personal. estate, at their discretion, and to invest the proceeds in bonds and mortgages, or in productive stocks, as they might deem best.

The estate consisted of a large amount of the stocks of the Camden and Amboy Railroad Company, Delaware and

Raritan Canal Company, and Philadelphia and Trenton Railroad Company (which, as they were of the same value and paid the same dividends, I shall call collectively the Joint Company stocks), a large amount of canal and railway bonds, and divers other stocks, and a valuable real estate which was sold by the executors.

John Potter, the oldest son, arrived at age, and on January 21st, 1858, the executors paid him $127,250, on account of his share of the estate, and among the securities transferred to him in this payment were 488 shares of the Joint Company stocks. William H. Potter, the second son, arrived at age, and on December 2d, 1859, the executors paid him, in like manner, $127,345, and among the securities transferred to him in such payment were 498 shares of the Joint Company stocks. In both cases these stocks were transferred at par, but their then market value was ninety per cent.

Shortly after these payments, all the executors, excepting Richard S. Field, ceased to act, and he became the acting executor, and subsequently, by the death of the others, the surviving executor. At the time of the payment to the sons, the trust funds were intact, and the executors evidently paid to each son one-fourth of the estate remaining, after reserving an ample fund for the payment of the annuity and expenses of administering. After he became the acting or surviving executor, Mr. Field committed a *devastavit* upon the trust fund, and at his death a large deficiency, both of principal and income, existed, which his private estate is insufficient to make good. After the payment to the sons, no allotment of the securities was made either to the daughters or to what I shall call the annuity fund, but the whole were held as a unit. The Joint Company stocks appreciated largely in value, and large cash and stock dividends were declared upon them, so that the 994 shares remaining after the payment to the sons, and of the then value of about $90,000, are now transmuted into $150,000 of United States bonds, besides 264 shares now in the

receiver's hands, worth about $35,000, and 100 shares which Mr. Field paid to William H. Potter, as an additional payment to John and William on account of their shares in the increase of the annuity fund, making the total increase in this investment at least $130,000 in currency, besides cash dividends and interest. On April 1st, 1867, and presumably after the *devastavit* began, Mr. Field paid to William H. Potter $20,000 in Camden and Amboy Railroad bonds, and on March 10th, 1870, 100 shares of Joint Company stocks, as the alleged shares of John and William in the accumulations of the annuity fund. Burlington and Mount Holly Railroad shares have also appreciated by stock or scrip dividends.

It is contended on the part of the daughters that the transactions between the executors and the sons in 1858 and and 1859 were not *payments,* but *allotments of specific securities,* and that it was the duty of the executors to have allotted, in 1859, to each of the daughters, a *like number of shares of the same securities,* and to the annuity fund mortgage securities of proper amount, and that this court must deem this allotment to have been made, as in equity it should have been made; and that, therefore, as the sons had been allotted 986 shares of the Joint Company stocks, the 994 remaining shares must be taken to have been allotted to the daughters, and these shares, with their accretions of principal and income, and the substituted securities—*i. e.,* the United States bonds, which are clearly identified as such— have always been and are still the unwasted property of the daughters.

On the part of the sons it is contended that they were *paid* $127,300 each, in depreciated securities in part, and that as no allotment has ever been made of specific securities to the daughters, either by the terms of the will or the action of the executors, the daughters have never been, and are not now, entitled to anything more than $127,300 each, and the legal interest thereon (exclusive of their interest in the annuity fund), and that all accretions, principal and

interest, belong to the annuity fund, for the equal benefit of the sons and daughters.

I do not think either position is well taken, and I shall proceed to announce the equitable rights of the parties in the trust funds as they seem to me, after careful consideration.

It is not disputed by either party that each son, as he arrived at age, was entitled to receive the sum of $127,300. The direction of the will was, that the share of each son should be *paid* to him, and a literal compliance with this direction required the executors to sell the securities at market prices, and pay the proceeds to the sons; instead of so doing, they transferred certain securities to each, at agreed prices; a course which is perhaps generally pursued in such cases, and is tantamount to selling the securities and paying over the money proceeds, provided the agreed prices are equal to the market prices; no attempt has been made to impeach the fairness of the transactions or of the prices, and the evidence as to the agreed price of the Joint Company stocks is, that it was above the market value, the sons taking it at $100 per share, while the market value was but $90. (See p. 22, line 28 of the depositions, and p. 9 of defendants' exhibits.) I conclude, then, that these transactions were, to all intents, sales of these securities and payments of the proceeds to the sons, and a fair compliance with the directions of the will, and that the effect, as between the *cestuis que trust*, is the same as if the securities had been sold to third persons in open market. Whether, eventually, the sons gained or lost by these transactions, whether they afterwards sold these stocks at $90, or retained them until they were worth $160, can no more concern the executors or the daughters than if purchasers in open market had sustained such loss or gained such profit; nor can the fact that the sons were the purchasers, any more affect the equitable rights of the daughters in the remaining securities, than if third persons were such purchasers. The only pertinent inquiries are, Were these transactions

fair? Were they in substantial compliance with the will? I must answer both questions in the affirmative, and decide that they can have no influence or bearing upon the rights of the daughters in, or the dealings of the executors with, the remaining trust funds, other than that they established that the sons have received the shares to which they were under the circumstances entitled on arriving at age.

But it is insisted on the part of the daughters, that it was the plain duty of the executors, at and after the settlement with William in 1859, to have made an allotment of the remaining securities among the daughters and the annuity fund, clearly separating and appropriating certain securities to each share, giving to each daughter (in round figures) $127,000, and to the annuity fund $136,000; and that, in making such allotment, equality should have been preserved between the sons and daughters, and, as the sons had received 986 shares of the Joint Company stocks, the remaining 994 shares should have been allotted to the daughters, and that the propriety of such allotment is strengthened by the plain duty of the executors, to allot first to the annuity fund (which is the primary charge upon the trust fund) the most certain and fixed securities, to wit, the bonds and mortgages.

Now, it is clear that the executors ought, at and after the settlement with the sons, to have allotted the proper securities of the estate in the proper proportion, but in this case, a *prior* duty was also imposed upon them; the trust fund at that time consisted of about $150,000 in bonds and mortgages, and $241,000 in Joint Company and other railway stocks and bonds, and other private stocks and.bonds, and the immediate *cestuis que trust* were two infant daughters and the widow of the testator, whose dependent and defenceless condition entitled them to extraordinary care and prudence on the part of the trustees, and would have called forth the most rigid protection of this court if its aid had been then invoked. I cannot conceive that this court would have permitted $241,000 of these funds—more than three-fifths of the whole—to remain in investments unau-

thorized by the practice of the court, and, in my opinion, unauthorized by the will.

In New Jersey, executors and trustees, unless otherwise *specifically directed* by the will or trust deed, will only be authorized or permitted to invest trust funds in bonds and mortgages, and bonds or stocks of this state or the United States. *Gray* v. *Fox, Sax.* 259; *Vreeland* v. *Vreeland,* 1 *C. E. Gr.* 512, 530. And the like rule, requiring such investments to be made in certain government stocks fixed by statute and the rules of the court, is enforced in England. *Hill on Trustees* (4th Am. ed.) 369; *Lewin on Trusts* (2d Am. ed.) 337.

In this will the executors are authorized to sell both the real and personal estate of the testator, and invest the proceeds "in bonds and mortgages, or in productive stocks," at their discretion. Here is no *specific direction* to invest or continue investments in *certain named* stocks; the investments *primarily* contemplated by the testator were those in "bonds and mortgages," (*Earlom* v. *Saunders, Amb.* 240; *Cowley* v. *Hartstonge,* 1 *Dow* 361; *Cookson* v. *Reay,* 5 *Beav.* 22,) and the alternative discretion to invest in stocks could only be exercised when the executors were unable to make investments on bond and mortgage. If bonds and mortgages could not be obtained, then the "productive stocks" in which they were authorized to invest must be construed, in the absence of specific directions in the will, to be intended to mean, and to mean, "stocks" such as would be approved by this court—stocks or bonds of this state or of the United States. In such investment the executors must exercise their discretion, just as this court would exercise it. A review of all the authorities, in this country and in England, may be fairly taken to establish the following rule : "That, if the discretion given by the will or deed, as to investments, is couched in general words, as 'good security,' 'stocks,' 'productive stocks,' 'public stocks,' or 'at discretion,' without specifying any particular securities or stocks, the executors or trustees will only be per-

Ashhurst *v.* Potter.

mitted to exercise their discretion as the court under whose jurisdiction they are acting would exercise it, and will be allowed to invest only in such securities as are approved by the rules and practice of such court." I do not think the court of chancery of this state would permit any trustee to invest in the stocks or bonds of a private corporation. Such investments are hardly distinguishable from " personal securities," for their safety is dependent upon the vicissitudes of trade and the integrity and sagacity of directors and managers. The incessant fluctuations in the values of such stocks among us, and the frauds and follies of directors, occurring almost daily, make the idea of " safety," in such investments, ridiculous. Nor can I think that any investments dependent upon such elements would be permitted by this court, in the absence of precise testamentary direction or the controlling force of a statute. The governing principle in courts of equity is to require trust funds to be invested in those securities whose values nearest approach to immutability,—*i. e.*, loans secured upon real estate, or stocks and bonds of the "state." But it may be said that these executors did not *make* investments, but merely *continued* investments made by the testator, in private stocks. I cannot think that this altered their duty or responsibility. At the testator's death they were clothed with full powers to act, and the duty of acting was imposed upon them. They were bound to act, and to invest in public securities or bonds and mortgages. Retaining improper investments was, in effect, *making* them; retention in such cases is a positive *act;* and the fact that the testator had considered these stocks good investments, and had invested in them, cannot excuse them for investing in them. *Hemphill's Appeal*, 18 *Pa. St.* 303. I cannot, therefore, hold that these executors should have made *any* allotment of *these* shares, but I am of opinion that it was their duty to have converted all these stocks and bonds, amounting to $241,000, into bonds and mortgages, or bonds of this state or of the United States, and *then* to have allotted *those securities* in the

Ashhurst *v.* Potter.

proper proportions to the three funds, holding them separately, and properly identified with the respective funds, and keeping separate accounts of each.

The executors neglected their duty, and involved the shares of the daughters and of the annuity fund in the hazards of separate speculative investments in each of these unauthorized stocks. As between the *cestuis que trust* and the executors, the latter were bound to account for all profits, and to make good all losses. But the *cestuis que trust,* as between themselves, became unwilling tenants in common in each of these investments, each of the daughters owning an undivided thirty-two and one-half per cent. of each investment, and the annuity fund an undivided thirty-five per cent. thereof, and in this proportion they must share in the profits and losses of each investment. If the securities representing either the principal or income of any of these investments can be traced and identified, they must now be divided among them in these proportions. I have arrived at the percentage of each share by estimating the value of the whole trust fund, taking the securities at par, at $391,000, the value of each daughter's share at $127,300, and of the annuity fund at $136,400, at and immediately after December 2d, 1859, the date of the settlement with William H. Potter.

The only investment that resulted in any considerable profit was that in the Joint Company stocks, of which, at the last-mentioned date, the trust held nine hundred and ninety-four shares. This number was increased, by stock dividends made between this date and January, 1868, to one thousand three hundred and sixty-four shares. On December 10th, 1863, Mr. Field, the acting executor, converted one thousand of these shares into $150,000 of United States bonds, now in the hands of the receiver, and, on March 9th, 1870, he transferred one hundred other of these shares to William H. Potter, as an alleged payment of $5,000 each to William and John of their shares in the increase of the annuity fund (John having previously

41

assigned his share in said fund to William), and the remaining two hundred and sixty-four shares are now held by the receiver. The daughters are, by the will, entitled to receive, every year, as their absolute property, all income of their respective shares, but the principal remains in the trust, and of it they are only tenants for life. The accounts of their principal and income must, therefore, be separately stated, and any securities in the receiver's hands which can be identified as part of their principal, must be set apart for them, whilst any that can be identified as part of their income, they are entitled to receive absolutely. The account of the principal and income of the annuity fund may be stated together, as all accumulations of its income must be annually added to the principal, and all securities in the receiver's hands, which can be identified as part, either of the principal or income of that fund, must be set apart as belonging to the principal of that fund, the annuity having always been regularly paid. The directions now to be given, as to the stating of the several accounts, in respect to these stocks, will probably be sufficient for stating the accounts of all other investments, if any, the securities or substituted securities of which can be identified, while the residue of the accounts may be stated by crediting them with their proper proportion of principal in dollars, and with income thereon at the legal rates of interest,—*i. e.*, six per cent. to July 4th, 1866, and seven per cent. since that date—where the actual income cannot be ascertained. In stating the accounts of the *principal* of the two daughters as to these Joint Company stocks, each account must commence with a credit to each daughter, of the date of December 2d, 1859, of three hundred and twenty-three shares of these stocks, at par. This item will stand unchanged until December 10th, 1863, when the shares were converted into United States bonds, and the necessary entries must be made to show the conversion of these three hundred and twenty-three shares into $48,750 of United

States bonds, at par, which item will remain unchanged to the end of the account.

In stating the accounts of the *income* of the daughters, as to these stocks, each account must be credited with the actual dividends, in cash, declared upon the three hundred and twenty-three shares from November 1st, 1857, to December 10th, 1863; and with the interest, in gold, on $48,750 of United States bonds, from the last date to the close of the account; and with one hundred and twenty shares, or thirty-two and one-half per cent. of the three hundred and sixty-four shares of stock dividends (it not being contested that these stock dividends represent unpaid earnings), as of the dates when such dividends were declared, and estimating the stock at par; and with the cash dividends declared on such stock from the time of declaring the stock dividends to the close of the account.

In stating the annuity fund account as to these stocks, it must be credited with three hundred and forty-eight shares of the stock of the date of December 2d, 1859, at par, which item will stand unchanged until December 10th, 1863, when the shares were converted into United States bonds, and at the last date entries must be made showing the conversion of the three hundred and forty-eight shares into $52,500 of United States bonds, at par, which item will remain unchanged to the end of the account; and it must be credited with the actual cash dividends upon the three hundred and forty-eight shares from November 1st, 1857, to December 10th, 1863; and with the interest, in gold, on $52,500 from the last date to the close of the account; and with one hundred and thirty shares, or thirty-five per cent. of the three hundred and sixty-four shares of stock dividends, at par, and as of the dates when such dividends were declared; and with the cash dividends declared on said stock from the time of declaring the stock dividends to the close of the account.

The *income* accounts of the daughters, and the account of the annuity fund, must be respectively charged with their proportionate shares of all taxes.

These directions make the *principles* upon which the accounts should be stated, sufficiently clear; but, if not, I will make such further explanation as the counsel and. accountant may require. In addition to these accounts, the accountant should prepare a schedule of the existing assets of the trust, and their present values, to be fixed by the agreement of counsel, and a schedule of Mr. Field's private assets and their estimated value, which I shall append to my report, together with the accounts.

It is apparent, from what I have already decided, that I hold the transfer of $20,000 in Camden and Amboy bonds to William H. Potter, in 1867, and the transfer of one hundred shares of Camden and Amboy stock to the same, in 1870, under the pretence that they were the amounts to which John and William were entitled as their shares of the increase of the annuity fund, to have been altogether unjustifiable. I shall report that William H. Potter was not entitled to receive either the bonds or the stock, and that he must replace them, or account for them at their present values, and must also account for all interest and dividends thereon received by him, or accrued or earned and declared thereon since the transfer of them to him. In this connection I will say that I shall recommend to the chancellor to reduce the fund reserved to secure the annuity to $52,500 of United States bonds, and $55,000 of bonds and mortgages, and to pay one-half of the residue of the existing annuity fund to William H. Potter, in his own right and that of his brother John, and to add one-fourth thereof to the share of each of the daughters.

It is contended by William H. Potter that he is entitled to charge upon the whole existing trust assets any loss he may sustain in the collection of the note of Robert Habersham, bought by him from the executors in December, 1859, for the reason that the note was not then endorsed to him so as to give him the *legal* title, nor then delivered to him, nor afterward when requested. It is not necessary to recapitulate the history of this note and the action of the parties

Ashhurst *v.* Potter.

in relation to it, as detailed in the depositions and exhibits. I am of opinion that William consented to accept the equitable title to the note as sufficient consideration for the execution of the release, and that he left the note with the executors for his own convenience, and constituted them, individually, his agents for its custody, and that, as between him and his *co-cestuis que trust,* his release is valid and effectual as a bar to this claim; and that, *without such release,* he cannot now call upon his sisters and the annuity fund to make good the damages he has sustained by the wrongdoing of his own agents, or for their malfeasance, if any, as executors. If, notwithstanding the release, he ever had any valid claim against the other *cestuis que trust,* I am also of opinion that he has lost it, by his own lack of diligence in obtaining the legal title to, and possession of, the note, and in the proceedings for its collection, and that his claim against them has become "stale" by lapse of time, and cannot be enforced in equity. He has never rescinded the contract of purchase, which he was bound to do promptly if he desired to escape the effect of his release, but has continued to be, and still is, the equitable owner of the note, prosecuting it for his own use, in the name of the executor. Thus, he has retained all the benefit of the contract of purchase, and seeks to make the trust fund liable for the results of his loose dealings with the individuals then acting as executors. The claim, too, is for damages which he has not yet sustained, and cannot be an element in this account. I shall report that no allowance should be made to William H. Potter on account of the Habersham note.

There is a deficiency, through the *devastavit* committed by Mr. Field, in the assets both of the principal and income of each of the daughter's shares, and also in the assets of the annuity fund, and it is contended, on the part of the sons, that the deficiencies of *principal* of the daughters' shares, and the whole deficiency of the annuity fund, should be proved against and paid out of Mr. Field's private estate, before the deficiencies of the daughters' *income* should be

permitted to be proved and paid; that the principal, or corpus, of the fund has a superior equity to the income, and is entitled to priority of lien upon the estate of the delinquent executor. *Hemphill's Appeal,* 18 *Pa. St.* 303, 305, is cited in support of this position. It will be found, however, that this case did not present to the court, nor did the court decide, the question of marshalling the claims of principal and income of a trust against an insolvent estate of a trustee, but merely that, on the complaint of the life tenant, the court is bound to protect the corpus, as well as the income, of the trust fund, and that both should be accounted for; but no opinion is expressed as to their priorities. The fair inference is, that the court considered the equities of the claims, in that case, to be equal. No other case is cited, nor have I been able to find any case bearing upon this point. I am unable to see any superior equity in the claims for principal over those for income; they arise from the same trust, are equally meritorious, and those claiming for deficiencies of *income* are among the immediate objects of the testator's bounty, while a large portion of those interested in the *principal* funds are remoter objects of that bounty. If the annuity itself were in arrear and unsecured, that claim would, perhaps, be entitled to priority. I am of opinion that the claims for deficiencies, both of principal and income, should be proved against, and paid out of, Mr. Field's private estate, *pari passu;* and I am also of opinion that they are valid claims against this estate only, and that there is no equity entitling any one of these funds to be made good out of, or at the expense of, any other.

It was contended, on the part of William H. Potter, that a considerable sum was due to him, for income due and unpaid to him before arriving at his majority. The claim is not substantiated by distinct proofs, and the proof would have to be very clear to overcome the presumption of the settlement of all such demands, when the executors settled with him in December, 1859. I must regard this claim as having then been settled, or waived; and at all events it is

·" stale " from lapse of time. I shall report against the allowance of the claim.

The only remaining matter for consideration is, whether the Rochester water bonds, and the Mississippi and Lake Superior railroad bonds, are assets of the trust, or of Mr. Field's private estate. There is nothing on the face of the bonds to indicate that they are trust assets, and the only *evidence* to support that theory is the letter of Mr. Keasbey, p. 232 of the printed book, which, by consent, has the same force as if he had been examined, and had deposed *in hæc verba.* When the mental condition of Mr. Field at that time is considered, but little weight can be attached to his declarations. Probably these securities were purchased with trust funds, but he has wasted the trust funds under John Potter's will, as well as under Thomas F. Potter's will; and of this latter he has wasted both principal and income, and it is impossible to decide with which funds, or with what proportions of any or all of them, he purchased these bonds. The effect of holding them to be assets of these trusts would make it necessary to decide in what proportions the two estates are interested in them, for which I have no evidence or data whatever. To hold them to be assets of the Thomas F. Potter trust would be to appropriate them wholly to principal, although they *may* have been purchased wholly with embezzled income. I shall report these securities to be part of Mr. Field's estate, and thus secure an equitable appropriation of them among both trust funds, and all parts of them, as all deficiencies of both funds, of income as well as principal, will be proved against them.

The opinion of the court was delivered by

Dodd, J.

The questions in these cross-appeals relate to the distribution of personal estate under the will of Thomas F. Potter, deceased, late of Princeton, in the county of Mercer. By

the will, made in 1851 and proved in 1853, James Potter, Robert F. Stockton and Richard S. Field were appointed executors and guardians of his children till twenty-one years of age. An annuity of $6,000 was given to his wife during life, and a reserved fund to produce it was directed to be set aside by the executors. All his residuary estate was then given to the executors in trust for his children, who, at his death, were four: John aged seventeen; William H., fifteen; and two daughters, Elizabeth and Alice, who were younger. The residue was directed to be equally divided between the children, share and share alike; the shares of the sons to be paid to them respectively on becoming twenty-one (the interest, meanwhile, or so much as was necessary, to be applied to their education and support); the two daughters to have the interest only of their shares during life, and the principal to their children.

No reserved fund for the annuity was actually set aside by the executors, but the whole assets held by them for the widow and children continued in an undivided mass till 1858, after the oldest child had come of age. These assets were about $645,000, being the stocks and bonds of railroad, bank and other corporations, besides ordinary bonds and mortgages. About $340,000 of the assets were the stocks and bonds of the Joint Companies of New Jersey (Camden and Amboy, &c.), which, together with the other assets, except bonds and mortgages derived from the sale of real estate, were owned by the testator at his death.

In this condition of the estate, John Potter, the eldest son, became of age, and entitled to his share of the residuum, under the fifth clause of the will. The executors, on the 21st of January, 1858, transferred and delivered to him securities amounting to the agreed value of $127,250, the receipt of which he acknowledged by his deed, specifying the securities and the value of each as so much money on account of his share of said estate. The securities so transferred to him were selected from the different kinds composing the entire mass, with an evident, though not exact,

Ashhurst *v.* Potter.

regard to proportionate parts. The remaining assets were held by the executors in the same undivided state, till the second son, William II. Potter, came of age and entitled to his share—that is, till December 2d, 1859, when the executors transferred and delivered to him securities selected as John's had been, and amounting to very nearly the same agreed value—viz., $127,345—the receipt whereof he acknowledged, by a deed similar to his brother's, as so much on account of his share of the estate.

The first and controlling question in the suit grows out of the transactions up to this point, and is the question of the true construction and effect to be given to these transfers to the sons—For whom and in what manner, from December 2d, 1859, must the assets then remaining, and valued at $391,000, be now deemed to have been held?

From the date just named to Mr. Field's death, in May, 1870, a period of about ten years and a half, the estate was exclusively in his hands, his co-executors having died or ceased to act. During this time a great increase took place in the productiveness and market value of some of the assets—*i. e.*, the Joint Companies' bonds and stock—but, during the same period, large losses occurred to the estate, by reason of mismanagement on the part of the acting trustee. These two facts make it the interest of the sons, on the one side, and the daughters on the other, to contend for different constructions of the above transfers to the sons.

On the 7th of June, 1870, soon after the death of Mr. Field, the two daughters, with their husbands and minor children, filed their bill in this suit against the two sons, together with Francis S. Conover, Mr. Field's administrator, praying that an account might be taken of the trust estate, a receiver appointed, the alleged waste made good, and such further orders and decrees as in the premises might be fit. Answers were filed, and, on the 1st of August, 1871, a reference was made to Mr. Gummere, as master. The testimony taken before him, the exhibits offered, and the extended statements of accounts prepared

by experts on behalf of the respective contestants, evince the particularity and thoroughness with which the investigation on both sides was conducted.

To the master's report, dated December 9th, 1872, numerous exceptions were filed, both on behalf of the daughters and the sons, all of which, upon argument before the chancellor, were overruled, with the exception of two, involving slight or clerical errors. By an order of January 5th, 1875, the cause was recommitted to the master, to whose second report, dated March 20th, 1877, numerous exceptions on both sides were again filed, and all but one, relating to interest, overruled by the chancellor, from whose final decree, dated June 6th, 1877, the contending parties have taken the cross-appeals argued in this court.

The argument here turned mainly on what has been said to be the first and controlling question in the case—namely, that of the construction and effect to be given to the transfers of property in 1858 and 1859, to the sons. For whom and in what manner should the funds or assets remaining after such transfers, be now deemed to have been held? Taking these assets or securities at the same value that was put upon securities of the like kind when transferred to the sons, they then represented the sum of $391,000. They included nine hundred and ninety-four shares of the Joint Companies' stocks, at par value, $99,400. The two sons had received from the executors nine hundred and eighty-six shares of these stocks—John four hundred and eighty-eight, and William four hundred and ninety-eight shares. The nine hundred and ninety-four shares retained by the executors increased greatly in value during the following years. Large cash and stock dividends were declared, three hundred and sixty-four new shares being in this way added to the nine hundred and ninety-four, which latter were subsequently converted into United States bonds, at the par value of $150,000, making, as the master reports, a total increase in this kind of security or investment of at least $130,000, in currency valuation, besides the dividends

Ashhurst *v.* Potter.

paid in cash, and besides interest. The same stocks, when transferred to the sons, were taken and receipted for by them at par, though at that time their market value was but ninety per cent.

On behalf of the daughters it was contended, before the master and the chancellor and in this court, that the transfers to the sons were not properly *payments* to them, but allotments of specific securities; and that, in 1859, it was the duty of the executors to have separated the respective portions of the daughters from each other and from the annuity or reserved fund (setting apart mortgage securities of a proper amount for the annuity fund) and to have allotted to each of the daughters a like number of the same securities that had been delivered to the sons; that equity will now administer the assets as if such allotment had been actually made, for the reason that what ought to have been done will be treated as done. The result of this would be to give exclusively, or nearly so, to the daughters the accretions on the Joint Companies' stocks, and on the government bonds into which some of the stocks were converted.

On behalf of the sons it was contended that the securities taken by them were taken as cash; that there was no allotment or partition of securities, as such, to them, but simply so much money received by them on account of their shares; that equal amounts should now be set aside or held for the daughters, with proper adjustments for interest and past receipts, and that all the accretions sought to be appropriated exclusively by the daughters, should be divided equally among the daughters and the sons, due provision being made for the reserved fund. In other words, they insist that the equal shares to be paid them under the will are those which shall now be equal with the amounts to be held for the daughters, taking into account the receipts and payments heretofore made.

Neither of these methods of distribution was approved by the master or the chancellor. One based on a different view, and intermediate between those contended for, was

advised by the master, and adopted in the decree. According to the view so adopted, the assets or securities remaining after December 2d, 1859, and valued at $391,000, were held by the executors as a unit, or in mass, for the two daughters and the reserved fund—belonging to the two daughters and those interested in the reserved fund as tenants in common of undivided personal estate. The decree treats the sons as having received, upon their coming of age, their equal shares under the will, after holding back, as was necessary, a reasonably ample sum, the interest of which would enable the executors to pay the $6,000 yearly to the widow, and also certain smaller charges to which the estate was subject, and to have a margin against contingencies to which it was exposed. The amount left for this reserved fund, after the payment of $127,300 to each of the sons and the allowance of the same amount for each daughter, was $136,400, about thirty-five per cent. of the whole remaining estate, the share of each daughter therein being about thirty-two and one-half per cent.

I think this view is the most correct and satisfactory that can be reached. The claim of a specific allotment of securities is inconsistent with the facts as they occurred. The transfers to the sons were meant to be what they were described at the time to be—*payments* on account of their shares. They were receipted for as so much cash paid, and I think it equally clear, from all that occurred at the time and afterwards, as shown by the documentary evidence, that the payments were then understood to be in fulfillment of the provisions of the will, by which the equality of their shares was referable to the time of their coming of age, and not in the sense contended for, as referable to the final distribution of the reserved fund. The last-named fund and the shares of the daughters are properly adjudged to be represented by each remaining security in the proportions above named. If the $391,000 remaining had been money, and had been invested, for example, in one mortgage, or in five mortgages of equal amounts, and held in the same gen-

eral way as the actual securities were held, without being partitioned or assigned, no difficulty would probably occur to any one in fixing the nature and proportions of the ownership as between the reserved fund and the daughters. Nor would it seem that, in the supposed case, the executors, though not perhaps literally or formally complying with the directions of the will as to setting aside the annuity fund or the share of each daughter, would have been liable to censure for investments as supposed, provided the securities taken were of an allowable kind. It is evident that each trust fund, in the event of loss or gain resulting from one or more of the mortgages, would be held to participate proportionally, if not as between the widow and children, yet certainly as between the children themselves; which is the case here. This is the principle of the decree. The accretions from the stocks and the losses by waste have been apportioned, according to the above percentages, between the daughters and the reserved fund.

It is a manifest objection to the soundness of both of the theories contended for by the parties, that they are judgments or elections after the event. Had the securities in question *decreased* in value, instead of *increasing*, it is safe to say that the theories now advocated would be resisted on both sides; and with justice. The contention for the sons, to the effect that it was the requirement or intent of the will that they should share in the *increase* and not in the *decrease;* that they should be gainers by the good management of the trustee in dealing with the remaining estate, after the payments absolutely to them, and not also losers by his bad management of the same estate; that the daughters were to take a part only of the gains in the former case, and to bear all the losses in the latter case, is without support in the will or the equity of the case. The principles of distribution, and also the manner in which they have been applied by the master to the making up of the different accounts; the apportionment among the daughters and the annuity fund of the money and assets derived from

the estate of the trustee, towards making good the losses by waste, are, in my judgment, as close an approximation to accuracy, both in principle and detail, as it is practicable to attain.

Among the numerous minor questions covered by the conclusion thus expressed, there are two which seem proper to be more specially referred to, growing out of the delivery by the trustee, in 1867 and in 1870, of bonds and stocks to William H. Potter, for himself, individually, and as the assignee of his brother John. The bonds and stocks so delivered were those of the Joint Companies—the bonds, at par value, $20,000, and the stocks, at par value, $10,000. They were taken by William in the belief, warranted by the representations of the trustee, that the accumulations of the reserved fund had been sufficient to enable the trustee to pass them over to William, on account of his undivided fourth interest in that fund, and the one-fourth interest therein assigned to him by John, and yet leave the fund large enough to yield the annuity to the widow. There is no reason to doubt that William took them in good faith, supposing his right to them good. In view, however, of the *devastavit* subsequently found, and committed certainly before the transfer of the stock, and presumably before that of the bonds, the decree imposes upon William the obligation to respond to the daughters and the annuity fund for the present value of the bonds and stock, such values being apportioned to each by the percentages before named. As to this part of the case, it was insisted, first, on behalf of the sons, that the decree is erroneous in charging them with these values; and, secondly, on behalf of the daughters, that the decree is erroneous in not charging the sons with interest on the coupons and dividends from the times when respectively due. I think that the decree, as to both points, is right.

The stock and bonds were part of the undivided mass, and belonged to the daughters and the reserved fund in the proportions as above. The waste of the trustee impaired

all the trusts proportionally, so that, in fact, the accumulations of the reserved fund had not been such as to warrant the transfers. If the contrary was believed to be true by the trustee, as it was doubtless believed by William, it would not entitle the latter to retain to his exclusive benefit and use the securities in question, free from liability to account for the same to his associated *cestuis que trust.* This is too plain to be disputed.

Nor do I think that the objection that it goes beyond and is unwarranted by the pleadings, can be regarded as well taken. The objection is, that there is nothing in the bill of complaint which authorizes any action against John or William Potter, or which makes them or their rights in this fund amenable to the decree. The answer to the objection is that the bill is for an account—for an ascertainment of the course and condition of the estate under the management of the trustee, of the disposition made by him of the funds and securities in his hands, where and what they are, as well as to recover from the estate of the trustee the alleged losses by waste—and, this being the expressed object of the bill, I am unable to see why what has been done is not strictly within its scope. The sons are defendants, and, in investigating the accounts and management of the trustee, the inquiry necessarily extended to what had been paid or transferred to them. A legitimate result to be reached was the adjustment of the respective accounts of the sons and the daughters as the same ought to have been adjusted by the trustee, showing the respective relations of the sons and daughters to the remaining estate of their father. This object of the suit was recognized and acted on throughout by both complainants and defendants. The evidence on both sides was produced and made use of to accomplish it. The decree but embodies the results so arrived at. It is not one for recovery against the sons, but adjudges the true condition of the accounts, deducting from the credits or shares due the sons the values of the stock and bonds with which they are found to be chargeable.

Ashhurst *v.* Potter.

The disallowance, in the decree, of interest on the coupons and dividends, is put upon the ground that one to whom money is paid as his due, and who receives it believing that it is his due, is not liable for interest upon it before demand made and refusal to pay, or until he shall have reason to be satisfied that he ought to repay it, and shall know to whom he should pay it. *King* v. *Diehl,* 9 *S. & R.* 409. There is no conflict between the rule applied in such cases and the rule that the holder of a coupon is entitled to recover interest thereon from the time it fell due. *Town of Genoa* v. *Woodruff,* 2 *Otto* 502. Nor with the rule that a debt universally bears interest from the time it is due. *Camden* v. *Allen,* 2 *Dutch.* 398.

Interest is the damages given by law for the detention of a debt. Up to the highest rate allowed by law, it may be regulated or waived by agreement of parties. On money lent to be paid on demand, no interest accrues or can be recovered until after demand made, unless the contrary be provided for by contract. Where money is paid and received under the mistaken idea that it is due to the person receiving it, an agreement to pay interest, either express or implied, is, of course, negatived and excluded, and, until discovery of the mistake and demand made, the obligation to pay interest as damages for detention or use of the money, does not legally arise. No injury arises from such detention, because it is the voluntary act of the party to whom the money rightfully belongs. *Volenti non fit injuria.* The cases are in accordance with this doctrine. *Jacobs* v. *Adams,* 1 *Dall.* 52; *Brown* v. *Campbell,* 1 *S. & R.* 176; *Second Street Railway* v. *Philadelphia,* 51 *Pa. St.* 465; *Hubbard* v. *Charlestown Railroad,* 11 *Metc.* 124; *Rowland* v. *Best,* 2 *McCord Ch.* 317.

The adjudged cases cited in opposition to the decree on this point, are all cases where there was no holding under a mutual mistake as to ownership, and are not at variance with those I have referred to. They stand on a different principle.

It does not appear in the present case what use, if any, was made of the money collected for the coupons and dividends. The supposition that they might have been invested and interest produced by such investments, suggests a question not presented by this case. The decree should be affirmed. Both parties having appealed, no costs will be allowed.

                Decree unanimously affirmed.