OF

## THE STATE OF NEW JERSEY.

### MAY TERM, 1891.

------

ALEXANDER T. McGILL, ORDINARY.

ABRAHAM V. VAN FLEET, VICE-ORDINARY.

------

WALTER BREWSTER, appellant,

*v.*

SARAH N. DEMAREST, respondent.

1. Where the beneficiaries under a will, who were also debtors to the estate, met together, three of them being executors of the will, and agreed upon and stated their respective indebtedness to the estate and the differences between them, and their respective shares in the estate, and afterwards acted upon their agreement, without questioning it, for fifteen years and until the particulars of the settlement were forgotten—*Held*, that they were severally bound by the agreement in absence of clear evidence of fraud, accident or mistake entering into it.

[559]

2. Investments, contrary to the requirements of the testator's will, upon mere personal security, are at the risk of the trustees, who must personally answer for any loss that may result from them.

3. In an executor's account the burden of proving items of discharge is upon the accountant.

4. When an executor has neglected to keep accounts and has failed to make investments according to the direction of the will and as the law requires, and, by his negligence, has involved the estate in litigation, he will not be allowed commissions.

On appeal from decree of the Middlesex county orphans court, upon exceptions to an account.

*Mr. Leslie Lupton,* for the appellant.

*Mr. Abraham V. Schenck,* for the respondent.

THE ORDINARY.

The decree appealed from charges the accountant, Walter Brewster, with $2,952.93 and interest thereon from April 1st, 1856, and, at the same time, strikes from the debit side of the account four items, amounting in the aggregate to $2,698, and disallows credits claimed by the accountant, which, together,. amount to $672.95.

The accountant is a son, and one of the executors of the will,. of George Y. Brewster, deceased, who died at Woodbridge, in Middlesex county, in July, 1853.

The decedent left a widow and six children. His children were Catharine, who, at his death, was insane, and who afterwards became an inmate of the State Asylum for the Insane at Trenton, and Ezra, Walter and Albert, the executors of his will, Sarah, the wife of Henry N. Demarest, and George, an infant. Walter, the appellant here and accountant below, had at one time been engaged in business in Michigan, where he became financially involved so that he borrowed considerable sums of money from his father. To secure the repayment of a portion of the amounts thus borrowed, he conveyed to his father a brick store and two dwelling-houses with the several parcels of land upon which they were erected. The father held the title to

these properties at his death. Immediately prior to his death the decedent made his will, by which, after several bequests and devises, he gave the residue of his estate in equal shares to his children, recognizing the wife of Walter in Walter's stead, so that Walter's share of his estate might be protected from his creditors. He also empowered his executors to sell his Michigan lands, and directed them to invest the portion or share which his daughter Catharine would take in his estate upon bond and mortgage, and use the interest for her support, and at her death divide the principal moneys among his heirs, who should then survive.

The will was made on the 4th of July, 1853. The three executors, Ezra, Walter and Albert, proved it and assumed its execution. On the 17th of August, in the same year, the executors filed and proved an inventory of their testator's personal estate, in which they included two notes and a bond upon which Walter was liable in amounts aggregating $4,386.56.

After the inventory was filed little was done towards the settlement of the estate. Walter assumed the care and custody of the Michigan property, and, about two years after his father's death, sold the brick store for about $2,500 (his co-executors joining with him in a deed thereof to the purchaser), and retained the proceeds of sale, or, as he says, gave them to his wife.

Afterwards, on the 1st of April, 1856, all the children met together and agreed upon a division of their father's estate, Walter taking a prominent part in making the calculations by which the division was arrived at. Each child was charged with the moneys he or she owed the father or had had from his estate after his death, and the sum of the charges against him or her was deducted from his or her distributive share of the estate. The children all, except Catharine, who was insane, acquiesced in the settlement. Walter was charged $8,289.93, which was $2,952.93 in excess of his distributive share of the estate, and Catharine was charged $406.21, which was $4,930.79 less than her distributive share. It does not appear how these figures were made up, but it has been satisfactorily shown that Walter was not only the leading spirit in ascertaining them, but that he

36

accepted them as correct. When the amounts were ascertained and agreed to, Ezra entered in an account book the total of the debits and credits of each child, and, until this controversy arose in 1870, his entry was recognized as the true statement of the several accounts settled and the division agreed upon.

No disposition of the remaining Michigan property was made by the executors, but in March, 1864, Walter, who had taken the title deeds of the property and was in possession of it, sold it for $2,100. His co-executors refused to join in a deed for it, and he alone made the conveyance.

Under what agreement or understanding Walter held possession of the Michigan property is a matter in dispute. He claims that the property was assigned to the share of Catharine, and that he was to manage and sell it for her benefit, but on the other side it is contended that, before the sale of the land, Walter claimed it as his own, insisting that his conveyance of it to his father was merely by way of security, and that when he paid the balance of his debt to the estate he would be entitled to a reconveyance. His co-executors represent that they refused to join in a conveyance until they were assured of the payment of the $2,952.93, which indebtedness from Walter's estate had been assigned to Catharine's share.

Catharine died in 1868 in the asylum—insane. Her sister and all her brothers survived her. After Catharine's death Sarah Demarest caused a citation to be issued to the three executors to account, and, in obedience to it, Walter alone accounted. By his account he charged himself with income derived from moneys of Catharine held by his brother-in-law, Henry Demarest, and his brother George, and also with $598, income from the Michigan property, and $2,100, the proceeds of his sale in 1864, and at the same time prayed allowance for sundry sums paid for the maintenance of Catharine and his brother Albert, and also for $311.20 "for interest on cash advanced at sundry times," $300 "for traveling expenses, postage and commissions for twelve years," and $61.75 "balance on Albert Brewster's expense."

Brewster *v.* Demarest.

To this account exceptions were filed by which it was first objected that the accountant should be charged with $2,952.93, with interest from the settlement of April 1st, 1856, instead of the income and proceeds of sale of the Michigan property, and then that he be allowed certain items of discharge, and among them the items $311.20, $300 and $61.75 just mentioned. As the decree appealed from exhibits, the orphans court allowed the exceptions to the extent they are here stated. Question as to the correctness of the charge of $2,952.93, with interest from April 1st, 1856, necessitates inquiry into the true *status* of the Michigan property. Was it Walter's, held by the estate as security of his debts, or was it property of the estate assigned to the share of Catharine?

Walter now disputes that he was indebted to the estate in the sum ascertained at the settlement, but he has not shown wherein that sum was wrong. No one remembers what items made up that sum. Walter was instrumental in fixing it. He acquiesced in it when it was fixed, and he subsequently submitted to it, without objection, for years. The settlement stated his account with his father's estate, and the burden was upon him to show that it was erroneous. In the absence of clear evidence of fraud, accident or mistake, he is bound by it. He does not now remember how it was made up. It is suggested that it may have been reached in this way: Walter's inventoried indebtedness to the estate was $4,383.56; subsequently he sold the brick store, retaining the proceeds of sale. It does not definitely appear what he got from that store. He says about $2,000 or $2,500. According to his statement, at the settlement in April, 1856, the value of the unsold dwellings was canvassed, and he expressed the opinion that they were worth about $3,000. Now, it is suggested, the addition of his acknowledged indebtedness upon notes and bonds, $4,383.56, to the price realized from the sale of the brick store and the value of the unsold dwellings, may have produced the amount charged against him at the settlement.

This appears to me to be within the bounds of probability, and as reasonable an explanation as the confused and conflicting proofs will admit. If it be correct, then the Michigan property

must be considered as Walter's, and his indebtedness of $2,952.93 must be accounted for by him.

The settlement in 1856 stated accounts, and it must stand unless Walter has shown that it was erroneous through mistake or fraud. As I have said, he has not shown such error.

If it must stand and the Michigan property is to be considered as Catharine's, how is the $2,952.93 to be paid? Is the property to be accounted for to Catharine, and is Walter yet to pay the $2,952.93? These questions suggest the correctness of the insistment that Walter was to take the property and pay the $2,952.93, for it is not to be supposed that when the settlement was made in 1856 two items of assets, Walter's indebtedness, $2,952.93, and the remaining Michigan property, were left without adjustment. Nor is it likely that for years thereafter all the children would quietly acquiesce in Walter's treatment of the remaining Michigan property as his own.

The whole course of conduct, both of Walter and his brothers and sister, lends credence to the conclusion that in making up Walter's account the Michigan property was regarded as belonging to him, and that the balance due from him to the estate was allotted to the share of Catharine.

The will required that Catharine's money should be collected and invested by the executors upon bond and mortgage. They failed to so invest it, but, instead, allowed it to remain in the shape of a personal indebtedness by one of their number. Such an execution of the trust imposed by the will is at the executors' risk, and they, as trustees, must answer for any loss that may result from it. Walter, with the other executors, acquiesced in the assignment of his indebtedness to the share of his lunatic sister, and the retention of it, in the shape of unsecured indebtedness, as an investment for her, and he, therefore, must be held accountable for the money, with interest. *Dufford* v. *Smith, 1 Dick. Ch. Rep. 216.*

The decree, then, so far as it charges the accountant with $2,952.93 and interest, is correct. And it follows that it is also correct in eliminating from the debit side of the account the

Brewster v. Demarest.

sums with which the accountant charges himself for proceeds of sale and income from the Michigan property.

The decree next deals with the following items:

For interest on cash advanced at sundry times............................... $311 20
Traveling expenses, postage and commissions for twelve years........... 300 00

These items are matters of discharge which must be proved by the accountant. I find no adequate proof of them.

The accountant was, and yet is, largely indebted to the estate. He never was in position to make advances to it. The moneys he paid for Catharine must be regarded as payments by him from his indebtedness. But in addition, he fails to particularize what amounts he advanced, when and for what lengths of time. The proofs do not show how the $300 was reached or otherwise exhibit its correctness. It is impossible to allow it.

The accountant claims that the traveling expenses and postage, charged in the next item, were expenses incurred in the management and disposition of the Michigan property. The view I have taken as to the *status* of that property indicates that they are chargeable to him individually, and are not chargeable to the estate.

The accountant has disregarded the honorable position in which his father's will placed him. He has failed to invest Catharine's share of her father's estate upon bond and mortgage as not only that will required, but as the due execution of his trusteeship obliged him to do. He has also failed to keep accounts or memoranda by which the condition of his trust can, with any certainty, be ascertained. As a result, we have this litigation. I think that the orphans court was correct in its conclusion, that his conduct was such that he is not deserving of compensation.

Another item disallowed by the orphans court was: "Balance on Albert Brewster's expense, $61.75."

I find no proof that will justify the allowance of this sum to the accountant. Albert became insane and was placed in an asylum, where he was supported by his brothers and sister. It is in evidence that they all consented to the taking of four sums of

$50 each from Catharine's money for his support, and the account-
ant was given credit for those sums, but it has not been made to
appear that the item here considered was part of the moneys
paid for maintaining Albert in the asylum, or that its payment
from Catharine's money for such a purpose was consented to.

I think that the allowance by the orphans court of $400 as a
counsel fee to the proctor of the exceptant, to be paid from the
estate, was, perhaps, in excess of that which the exercise of a
sound discretion would warrant, but the indiscretion does not
appear to me to be sufficiently marked to justify the reversal of
the decree appealed from.

I will affirm the decree, with costs.