The original bill in this cause was filed on December 22d 1938. An amended bill was filed herein on November 28th, 1939. The amended bill seeks a construction of the last will and testament of E. Stuart Dickerson, deceased; a decree directing the defendant executors and trustees to make discovery of the assets of said estate, and the value thereof at the time of the filing of the first, second and final accounts as executors and at the present time; an accounting by the said executors and trustees; it challenges the investment of *Page 37 
the assets of the testator's estate in non-legal securities and the retention by the executors and trustees of non-legal securities in contravention of the provisions of the testator's will, and seeks a surcharge against the executors and trustees because of losses thereby sustained. This court is also asked to take general jurisdiction of the administration of said estate and the trusts created under testator's will, and additional relief by way of discovery, accounting, c., is sought.
The cause originally came before the late Vice-Chancellor Davis on the return of an order to show cause why this court should not assume general jurisdiction of the administration of the trust estate and, pursuant to his opinion filed herein on April 10th, 1939, this court assumed such jurisdiction by an order advised by him on May 25th, 1939. After issue joined, the cause was referred to Vice-Chancellor Woodruff by order of reference dated March 20th, 1941. It was re-referred to Vice-Chancellor Sooy by order of re-reference dated March 27th, 1941, and re-referred to me by order of re-reference dated November 14th, 1941. Numerous preliminary and incidental motions and arguments were had before me from time to time and the cause first came on for final hearing before me on October 8th, 1945, and continued from day to day thereafter until October 15th, 1945, on which date the final hearing was concluded. Decision was reserved pending the filing of briefs by counsel for the respective parties in interest. Final briefs were filed with me on October 7th, 1946.
Edwin Stuart Dickerson, the testator, died on October 9th, 1930. His will was probated and letters testamentary thereon were granted to the defendants Woodward Tingle Dickerson and Camden Safe Deposit and Trust Company, the two executors named therein, by the Camden County Orphans Court on October 21st, 1930. The defendant Camden Trust Company is the successor, by merger, of the Camden Safe Deposit and Trust Company.
By the first paragraph "Seventh" (there are two paragraphs numbered "Seventh") of his will, the testator provided, in part, as follows: *Page 38 
"Seventh: — All the rest, residue, remainder of my estate, whether real, personal or mixed of whatsoever kind and wheresoever situate which I may own or have the right to dispose of at the time of my decease, I give, devise and bequeath unto my executor hereinafter named, in trust nevertheless for the following uses and purposes to invest said estate in legal securities and from the income therefrom arising to pay the following annuities: — "
Then follow provisions for the payment of several annuities, provisions for the suspension of some of them in the event of a deficiency in income, and for the disposition of the principal of the residuary estate in the event of the death of certain of the annuitants and beneficiaries.
The testator's estate was appraised, as of the date of his death, at $526,430.46, made up of personalty appraised at $492,275.46, and real estate appraised at $34,155. The entire personal estate, except for comparatively small cash deposits in banks, consisted of non-legal stocks, bonds and other securities. The executors' first account was filed on December 18th, 1931, and was duly approved and allowed by the Camden County Orphans Court by decree dated January 19th, 1934. The executors' second and final account was filed on or about June 9th, 1934, and was allowed by decree of the Camden County Orphans Court on June 29th, 1934. The executors of the will were also named as trustees, and upon the entry of the decree of the Camden County Orphans Court on June 29th, 1934, they took over, as trustees, the assets then remaining in the hands of the executors as shown by their final account. As trustees, they filed their first account on November 16th, 1938, and, on December 22d following, the original bill of complaint in this cause was filed and further proceedings on said account were suspended pending the disposition of the issues involved herein. A supplemental account was filed by the trustees in this cause on September 5th, 1945, and, by consent of counsel, that account is also now before the court for approval. This accounting is as of July 27th, 1945.
The primary question to be determined here is the effect to be given to the provision of testator's will touching the investment of his estate as contained in the paragraph hereinabove quoted. It is contended by the complainants that *Page 39 
the provision for investment in legal securities was mandatory upon the executors, and that it was their duty forthwith to convert the non-legals into cash and reinvest in legal securities in accordance with the mandate of the will. It is the contention of the defendants, however, that by statute they were authorized to retain non-legal securities owned by the testator at the time of his death, and that good faith and reasonable judgment and discretion in the sale and conversion of such assets was all that was required of them; that such of the non-legal securities as were retained were retained in good faith and in the exercise of that judgment and discretion which the law requires of them; that because of economic conditions existing at the time of testator's death and their assumption of the duties of executors and trustees, it would have been improvident for them to have disposed of the non-legal securities at that time, and that they are not, therefore, accountable for any losses suffered by reason of their retention and the subsequent decline in the value of those assets.
It is further contended by the complainants that the trustees are accountable for the inventory value of the assets of the estate as shown by the executors' final account, and which came into their possession upon the passing of that account; that the trustees were in duty bound to refuse to accept from the executors any non-legal investments, but that having accepted them, they must be taken to have accepted them at the valuation put upon them by the executors as shown by their final account. On the other hand, it is contended by the defendant trustees that they are chargeable only with the actual value of the assets so received by them as of the date of the passing of the executors' final account; and, further, that the decrees of the Camden County Orphans Court dated January 19th, 1934, and June 29th, 1934, approving and allowing the executors' first account and the executors' second and final account, as stated, are resadjudicata and that they cannot, therefore, be surcharged with any losses sustained by this estate during the administration thereof by the executors as such, no exceptions to the investments as shown by the schedules attached to those accounts having been filed by the complainants or other beneficiaries. *Page 40 
I shall consider these contentions under the following headings and in the order of their statement:
I. The effect of the direction to invest the estate in legal securities.
II. The effect of the final decrees of the Camden County Orphans Court of January 19th, 1934, and June 29th, 1934, approving the executors' accounts.
III. To what extent are the trustees accountable for inventory value as shown by the executors' final account.
IV. The trustees' liability for losses suffered by reason of the prior or subsequent decline in market values from inventory of retained assets received from themselves as executors.
 I.
Immediately after the testator's death the executors examined the will and assets and were thoroughly cognizant of the fact that all of the securities comprising the personal estate were non-legals, and that the will required investment of that estate in legal securities. There was no delay in fixing the value of such of the securities of the estate as were listed in market reports, such value being determined within a month after the testator's death. The executors were of the opinion that the above-quoted mandate of the will did not apply to investments made by the decedent in his lifetime, and they made no immediate effort to dispose of them. The evidence shows that not a single stock or security was sold during the first year of their administration although they could have sold most if not all of them at or near inventory, some better and some at slightly less, some time during that year. At the time the executors assumed charge of this estate the security market was declining, and the executors were cognizant of the fact that there had been a steadily declining market for at least a year prior to that time.
When the executors' first account was filed in December, 1931, the inventory value of the entire estate, including real estate, was $409,747.55. The market value at that time was $193,474.15. The difference in these two figures represents the decline in the value of the estate assets between the date *Page 41 
of the testator's death and the date of the account. At the date of the allowance of this account, on January 19th, 1934, the actual value of the estate had declined to $190,359.29. As of the date of the first day of the final hearing, the market value had risen to $251,307.21, and this after a deduction of $62,260.83 paid out for legacies, counsel fees, commissions, c. Thus it appears that the estate securities depreciated about $200,000 in the first year after testator's death and recovered about half that amount in the next 14 years. The retained securities, at the date of the first accounting, had a market value of $129,548.18. As of the first day of the final hearing the market value of the then retained securities was $95,412.17, but in the meantime some of the securities had been sold for $69,815.93. From this it appears that the value of the retained securities increased from $129,000 plus, to $165,228.10, or slightly more than twenty-five per cent. during this fourteen year period.
Prior to the statute of 1881 (P.L. 1881 ch. 115 p. 130; 2 Gen.Stat. 1709-1895 p. 2401 § 197), an executor or trustee could retain non-legal investments made by the testator only when the will specifically authorized such retention or contained a direction to invest the trust property in securities of the kind received from the testator. The purpose of the statute was to authorize the retention of investments made by the testatorexcept where the will "specially directs in what manner thetrust fund shall be invested." That act was a supplement to the Orphans Court Act and became section 197 of that act as contained in the General Statutes. And see, also, P.L. 1899 ch. 103 p.236; 2 Comp. Stat. p. 2271 §§ 34-36 — an act concerning the investment of estate funds and the retention of investments by executors, trustees, c., the third section of which contains the same excepting provision, and which was incorporated in the "Act concerning executors, and the administration of intestate's estates" (Revision of 1874 with supplements) as contained in theComp. Stat. 1709-1910, above cited. Ward v. Kitchen, 30 N.J. Eq. 31,35 and 36 (1878); Ashhurst v. Potter (Court ofErrors and Appeals, 1878), 29 N.J. Eq. 625, 631 and 632;Woodruff v. Ward, 35 N.J. Eq. 467, 470 (1882). As *Page 42 
the Dickerson will directs the executors "to invest said estate in legal securities," those statutes did not alter the pre-existing rule as applied to this estate.
Retaining investments is in effect making them. Ashhurst v.Potter, supra; Restatement, Trusts 669 ¶ 230 Comment "i." InConover v. Guarantee Trust Co., 88 N.J. Eq. 450; affirmed,89 N.J. Eq. 584, it was held that executors and trustees can not excuse their failure to invest an estate in legal securities by showing that they acted in good faith and with reasonable discretion. In that case Vice-Chancellor Leaming (at p. 457), said:
"When the instrument of trust specifically and clearly defines the powers of the trustees there can exist no possible filed for the exercise of discretion on the part of the trustee touching the powers he is permitted to exercise. Such powers being specifically defined are necessarily fixed and inflexible."
And he quoted from 28 Am. Eng. Encycl. L. 1063, as follows:
"`Trustees are bound to observe the limits placed upon their powers, either by law or by the trust instrument, and if they transcend such powers and cause damage to the estate they will be held responsible therefor, although they may have acted in perfect good faith.'"
The Vice-Chancellor further said that where the trustee exceeds his authority he acts at his peril. This decision was affirmed by the Court of Errors and Appeals on the opinion below.
In In re The United Conclave Building and Loan Association,135 N.J. Eq. 63, Vice-Chancellor Bigelow (at p. 66), said:
"Due care and good faith cannot justify a trustee who, under a mistake of law, intentionally does that which is prohibited or is beyond his powers or who intentionally omits what is required of him. He cannot plead the advice of counsel."
This statement was repeated by the same Vice-Chancellor inBrown v. Fidelity Union Trust Co., 135 N.J. Eq. 404 (at p.414). See, also, Covenhoven v. Executors of Covenhoven, 1N.J.L. ([*]210-212) 243-245; Graydon's Executors *Page 43 
v. Graydon, 23 N.J. Eq. 229, 233; Brewster v. Demarest,48 N.J. Eq. 559, 564; In re Buckelew, 128 N.J. Eq. 81, 87; FirstCamden National Bank and Trust Co. v. Wilentz, 129 N.J. Eq. 333,337; In re Shaw, 122 N.J. Eq. 536; 1 Perry on Trusts, §460.
Cases where investments have been retained in the exercise of reasonable discretion and good faith pursuant to statute or authority in the will, and surcharge has been denied, do not apply here. An example of such cases is In re Corn ExchangeNational Bank (Court of Errors and Appeals, 1931), 109 N.J. Eq. 169,171.
In Brown v. Fidelity Union Trust Co., supra, it was held that executors should convert into money corporate shares, part of the residuary estate, which were not such investments as the trustee of the residuary trust could properly accept, and that the settlement of their account as executors did not absolve them from this duty.
The conduct of the defendant executors and trustees must be appraised in the light of the law in force at the time of testator's death, as it is that law which governs the interpretation and construction of his will; and it is clear that the prohibition of the act of 1899 (P.L. 1899 ch. 103 p. 236; 2Comp. Stat. p. 2271 § 34-36) was then in force. It was so held by Vice-Chancellor Fielder in In re Shaw, supra, decided on December 3d 1937. In that case (at p. 539), he said:
"The will directs that funds of both trusts shall be invested in bond and first mortgage. The act of 1898 as amended (Comp.Stat. p. 3864 ¶ 137) and the act of 1899 (Comp. Stat. p. 2271
¶¶ 35, 36), as amended and supplemented, both specify securities in which trust funds may be invested and each directs that the act shall not apply where the testator's will gives special direction as to the manner of investment. * * * The prohibition of the acts of 1898 and 1899 against investment contrary to the direction of a will, is still in force * * *."
And he cites in support thereof, Brewster v. Demarest,supra; Ross v. Savings Investment and Trust Co., 120 N.J. Eq. 87; Gates v. Plainfield Trust Co., 121 N.J. Eq. 460; affirmed,122 N.J. Eq. 366. *Page 44 
"The will of the testator, * * * is a law to the executors. * * * Any deviation from such authority is illegal, and at their own risk." Covenhoven v. Executors of Covenhoven (Supreme Court,1794), supra. "The executors are bound to observe this direction of the will. The wisdom of the direction is not for their consideration." Graydon's Executors v. Graydon, supra.
"Investments, contrary to the requirements of the testator's will, * * * are at the risk of the trustees, who must personally answer for any loss that may result from them." Brewster v.Demarest, supra.
"Trustees should follow implicitly the instructions expressed in the trust agreement." In re Buckelew, supra. Even where securities are retained by a trustee pursuant to statute or a direction in the will, the trustee is privileged to retain them only so long as they remain safe. Wild v. Brown, 120 N.J. Eq. 31; Babbitt v. Fidelity Trust Co., 72 N.J. Eq. 745.
Counsel for the trustees contends that the gift of the residue to the executors in trust "to invest said estate in legal securities" is not a direction to the executors to invest, but a direction to the same individuals as trustees to "invest, c." The inference is that the executors could delay turning over the assets to themselves as trustees as long as they chose (three and one-half years here) and thus escape liability for their failure to convert non-legals into cash and invest in legals. I cannot agree with that argument. Ordinarily, the executors would have had a year in which to convert and reinvest, but if good judgment dictated, conversion should have been prompter. 2 Scott onTrusts 1235, 1239 ¶¶ 230, 230.2; Restatement, Trusts, ¶ 230, and Comment "b," p. 666, ¶ 231, p. 673, and Comment "c," p.676; Beam v. Paterson Safe Deposit and Trust Co., 82 N.J. Eq. 518.
The testator died in a period of economic unrest. Times were not "ordinary." Markets had been declining for more than a year — and of this fact the executors were fully cognizant. Conditions called for the exercise of sound judgment and in view of the mandate of the will, for prompt action. The corporate executor was supposed to be expert in the field *Page 45 
of estate administration and investment. If it was possessed of greater knowledge and skill than the average man, the individual executor, for instance, it was under a duty to exercise that superior skill. Tannenbaum v. Seacoast Trust Co., 16 N.J. Mis.R. 234, 250; 1 Restatement of the Law, Trusts, ¶ 174. But I think the evidence shows that it generally deferred to the judgment of its co-executor. Instead of acting promptly, the executors dawdled under the mistaken idea that they were authorized by law to retain securities owned by the testator at the time of his death notwithstanding they were non-legal investments. But "due care and good faith cannot justify a trustee who, under a mistake of law, intentionally * * * omits what is required of him." In re The United Conclave Building andLoan Association, supra; Brown v. Fidelity Union Trust Co.,supra.
It is frankly admitted by both the corporate and the individual executor that they had never heard of the provision in section 3of chapter 103, P.L. 1899 (2 Comp. Stat. p. 2271 § 36) that the act (which authorizes the retention of testator's investments) does not apply where the will or deed of trust "specially directs in what manner the trust fund shall be invested." The witness Fredericks, the assistant treasurer of the corporate trustee, testified that he understood that the trustee could use its own discretion about disposing of or retaining non-legal securities owned by the testator at the time of his death, and that his trust committee had the same understanding. They did not consider the direction of the will to invest in legals as mandatory, and thought they could use their own discretion as to the fact or time of sale; but if they did sell, then they had to invest in legals. Clearly, they were acting "under a mistake of law" — on their own responsibility, and not on the advice of counsel. (See transcript, page 629.) After they failed to convert within the year they should not be permitted to escape liability by continuing the delay and continuing as executors when they should be acting as trustees. They may, as executors, escape liability by virtue of the decree passing their final account in 1934, but not by delay in filing the account and turning over the assets to themselves as trustees. *Page 46 
Some light is shed upon the conduct of the trustees by the testimony of the individual trustee, Woodward T. Dickerson. At page 170 of the transcript he said, "* * * we risked our judgment. We stretched our interpretation of the will" to maintain income — income on legals being too low — "the income on a good many of the securities that we held was coming in at the rate, on the market price of those securities at that time, of ten and twelve per cent. Of course, we knew they were precarious securities to hold, but to sell them at that time would have defeated the purpose of the will. The widow's $7,500 a year would have been cut; and certainly, that figure with an estate of $400,000, if we couldn't pay that $7,500 we would have been subject to criticism. We were in a position where whatever we did we were going to be subject to criticism." And at page 364 he said, "I was trying to keep the whole estate in the condition that we had received it." "Retention for the present" was the watchword on the question of conversion.
It is evident that inventory values were fixed as of the date of testator's death on October 9th, 1930, because it was on the basis of valuations at that date that inheritance taxes were computed. It is also apparent that when the inventory was made and executed, market values had already dropped considerably. The retention of securities was influenced by a desire to convert at inventory values rather than market values, but with few exceptions the inventory values were never realized. I think it is plain that the judgment of the corporate executor was largely influenced by the desire of the individual executor who was, I think, more interested in income than in the preservation of the estate. Under the will the widow was first entitled to an annuity of $7,500. Next, the two sons, of whom the individual executor was one, were entitled to an annuity of $3,000 each. The widow's annuity has been paid continuously. Those of the sons have been paid in full for only a couple of years and since then only intermittently and never in full. The estate would perhaps have been better administered by the corporate executor alone. It yielded too much to the individual executor's wishes, with which it was often at variance. This is shown by the *Page 47 
fact that in the early forties the executors applied to the court for instructions touching the sale of certain securities as to which there was disagreement. The corporate executor thought best to sell. The individual executor did not, because he wanted to maintain income. Most of the securities involved in that proceeding were sold by order of the court. The results of the dawdling attitude of the executors toward conversion of estate assets, and of their failure to obey the mandate of the will, is best shown by a few examples which I shall now mention:
At the time of his death, the testator owned 282 shares of Chicago, Rock Island and Pacific Railroad 7% cumulative preferred stock. They were inventoried at $106, or $29,892. The market dropped to $93 at the end of 1930 but the executors held the stock, influenced obviously by the $2,000 annual dividend. The market at date of final account was down to $5 per share and as of the first day of the final hearing it was down to $1.50 per share. In the meantime 100 shares were sold to take a tax loss and 182 shares with a total value of $273 were still held by the trustees. They were never offered for sale.
The testator also owned 100 shares of Union Pacific Railway Common, inventoried at $200 plus, or $20,062.50. This stock was never offered for sale. At the date of the executors' first account it had declined to 71 and risen to 121.5 at the date of the final account. The market at the hearing was $138. It is down to $126 now. In 1931 it rose to $205 and declined to $70. In 1935 the market was as high as $197.82. Notwithstanding the constant rise and fall in price, the stock is still held by the trustees.
Testator also owned 17 shares of Fidelity-Philadelphia Trust Company, inventoried at $600 per share, or $10,200. At the date of the executors' final account it had declined to slightly over $300 per share. It was sold in 1942 at $140, a loss of $7,825.95. It was retained because of the income. In his testimony the individual executor said, "Well, we made a mistake on that to hold that one; we should have sold it sooner." But the mandate of the will was ignored and it was not offered for sale. *Page 48 
The testator also owned nine shares of Laurel Springs National Bank, inventoried at $250 per share. At the date of the executors' final account it had declined to $30 per share and it was sold in 1940 at $22. It was not offered for sale by the executors prior to the first accounting. In December following the testator's death the trust committee of the corporate trustee ordered this stock, and 10 shares of the Atglen National Bank, sold; but neither was offered for sale until 1940 when the Laurel Springs stock was sold at a loss of $2,052 and in 1942 when the Atglen stock was sold at a loss of $650.40.
Testator also owned 480 shares of Franklin Trust Company, inventoried at $24,960. This bank was closed in October, 1931, a year after testator's death. The stock was never offered for sale but retained and a total loss ensued. Mr. Fredericks said that when he joined the corporate trustee in June, 1931, "there was no inclination on the part of the trustees to sell."
These are but a few of the more than one hundred items of securities which came into the hands of the executors upon the death of the testator, and all of which were non-legals. There were a few items retained by the executors and sold at a profit over inventory, but nearly every item that was sold was sold at a substantial loss and most, if not all, of those retained if sold to-day would be sold at a considerable loss from inventory.
In Beam v. Paterson Safe Deposit and Trust Co., supra, it was held that a trustee cannot sit idly by and permit securities which have come into his hands from his testator's estate to steadily depreciate in value; that such conduct made a primafacie case of lack of good faith or failure to exercise reasonable discretion, and that the burden of explaining such conduct is upon the trustee. And when a security comes within the range of doubt it is the part of prudence and discretion to eliminate it from a trust fund at the earliest possible moment. This rule applies, of course, where the trustee has a right to retain securities in the exercise of a reasonable discretion; afortiori, where the will contains a mandate to the trustee to convert and invest in legal securities. And see *Page 49 Wills and Administration in New Jersey, by Alfred C. Clapp (Pocket Supplement to July 15th, 1942) paragraph 296, which reads as follows:
"Where a fiduciary receives investments which it is improper for him to hold or where a proper investment ceases to become proper, he is under a duty to dispose of the same as soon as he can reasonably and conveniently do so. If he fails to do so within that period of reasonable time, he is chargeable for the amount he would have received if he had properly sold the same with interest thereon."
The authorities cited by him fully support the text.
 II.
As indicated by what I have said above, there is no doubt in my mind but that the executors were grossly negligent in the administration of this estate, in that, under a mistaken idea of the law, they retained non-legal securities owned by the testator at the time of his death when, to their knowledge, the market for all securities was declining and had been declining for more than a year prior to the date of their qualification as executors. I think this plainly appears from the few examples that I have hereinabove referred to. In view of the mandate of the will there was "no possible field for the exercise of discretion" (Conover
v. Guarantee Trust Co., supra) with respect to the disposal of the non-legal securities held by the testator at the time of his death and the re-investment of the proceeds thereof in legal securities. The only question touching such negligence is whether they acted within a reasonable time after testator's death. Ordinarily one year after testator's death is considered a reasonable time for the settlement of the executors' accounts.People's National Bank, c., Pemberton v. Bichler, 115 N.J. Eq. 617.
But an executor charged with the duty of disposing of non-legal assets and investment in legal securities cannot sit idly by and permit securities which have come into his hands from his testator's estate to steadily depreciate in value. Beam v.Paterson Safe Deposit and Trust Co. (Court of Errors andAppeals), 81 N.J. Eq. 195. And when "a security *Page 50 
comes within the region of doubt, * * * it would be the part of prudence and discretion to eliminate it from a trust fund at the earliest possible moment." Beam v. Paterson Safe Deposit andTrust Co., 82 N.J. Eq. 518, 520. And where, as here, no discretionary power is vested in the executors with respect to the retention of non-legal securities, the rule of the cited case should be strictly applied regardless of good faith or lack of negligence. See Clapp, Wills and Administration in New Jersey, ¶296; and cases cited. The decision of Vice-Chancellor Howell inBeam v. Paterson Safe Deposit and Trust Co., supra, was reversed by the Court of Errors and Appeals (83 N.J. Eq. 628) but the quoted language of the Vice-Chancellor was not criticised. The appellate court held that as good faith on the part of the trustee was conceded, the special circumstances of the case showed reasonable discretion in the retention of the securities was exercised. But there was no room for the exercise of discretion here. We are thus brought to the question as to whether or not the decrees of the Camden County Orphans Court of January 19th, 1934, and June 29th, 1934, approving the executors' first, second and final accounts, are so far res adjudicata as to bar any surcharge against the executors as such.
To each of these accounts there was attached a list of securities in which testator's estate was invested. These lists contained a statement, both of retained investments and new investments, the retained investments being carried at inventory value. Thus the beneficiaries of the estate were apprised of the estate investments although there was, of course, nothing in the account or these lists to suggest whether the estate securities were legal for trust funds or not. While it was the duty of the executors to know this fact, I think it was not incumbent upon the beneficiaries to determine which of the securities appearing in those lists were legal and which non-legal. I think they had a right to assume that, the will having directed investment of estate funds in legal securities, the executors, after the lapse of more than a year, had obeyed that mandate. The executors' valuation of them, as shown by their accounts was such as to lull the beneficiaries into a *Page 51 
sense of security. And that may explain why no exceptions to these accounts with respect to the character of the investments listed therein were filed by any of the beneficiaries.
In In re Shaw, supra, Vice-Chancellor Fielder said, (at p.541):
"There is no statute requiring a trustee to annex to his account a list of securities in which the balance of his estate is invested; such requirement is by rule of court."
And he held that such lists were not a part of the account and that the decree approving the account was not res adjudicata on the question of the propriety of the investments unless that question was raised by exceptions to the account and passed upon by the court. This same question came before me in the instant cause in August, 1942, on a motion to strike interrogatories. After issue joined, the complainants propounded 370 interrogatories to the defendants and the motion was to strike 216 of those interrogatories on the ground that they were irrelevant and immaterial in that they related to matters covered by and adjudicated in the executors' account. The motion was denied on the authority of In re Shaw, supra, and the unreported decision of the late Vice-Chancellor Buchanan inCamden Safe Deposit and Trust Co. v. Fawcett, Case No. 5372 in the Prerogative Court. I felt bound by those decisions, but reference to my unreported opinion, dated August 6th, 1942, and filed herein, will show that, while I followed those decisions, I agreed with the criticism of them by Alfred C. Clapp, Esq., in his book 2 Wills and Administration in New Jersey 107 and in his article in 64 N.J.L.J. 357, and I said that,
"The remedy for this `unfortunate' rule of law, if one is needed, is with the legislature, or perhaps it lies in the suggestion of the Court of Errors and Appeals in Rothenberg v.Franklin Washington Trust Co., 129 N.J. Eq. 361, 363, that the list of investments be incorporated in the petition for accounting or in the account itself. In any event, to obtain that `repose' to which a fiduciary is of right entitled (In reRothenberg, 129 N.J. Eq. 377), the fiduciary should be required to make a full and complete disclosure of pertinent investment facts." *Page 52 
Since the date of that opinion, however, and on May 20th, 1946, the Court of Errors and Appeals decided the case of Pollack v.Bowman, 139 N.J. Eq. 47, in which it was held "that the statement of assets required by the Orphans Court rule to be annexed to the account is a part thereof and that an interested party, desiring to do so, must make timely objection to any item or items shown on the statement." Mr. Justice Colie, speaking for the Court of Errors and Appeals, distinguished the Pollack Case
from In re Shaw by calling attention to the fact that among other things in the latter case "the trustees invested in illegal investments contrary to the directions of the will." (In this connection it should be borne in mind that retaining investments is, in effect, making them, Ashhurst v. Potter, supra, and that the Dickerson will also contains directions to the executors to invest in legal securities.) In the Pollack Case there was a delay of 11 years after the filing of the executor's account before the investments listed therein were challenged. In that case the testator died on June 26th, 1930. The will was probated July 9th, 1930. The executors were also appointed trustees. The first and final account was filed on August 5th, 1931. No exceptions were filed thereto and the account was approved by decree of the Orphans Court on September 17th, 1931. The executors turned over to themselves as trustees the stocks, bonds and other securities representing the balance decreed to be in their hands. The trustees thereafter filed seven intermediate annual accounts, the last one on September 17th, 1938, all of which were approved by the Orphans Court. Each account had annexed thereto a schedule or a list of securities as required by the Orphans Court rule referred to. Three years and three months after the filing of the last account the bill in that cause was filed. In discussing the retention of securities by the trustees, Mr. Justice Colie said:
"We find that the trustees were not guilty of want of due care in retaining these stocks. It must be borne in mind that when these trustees took over the management of the trust upon their discharge as executors, that the country was then in the grip of a devastating depression. * * * In the light of after events, it is clear that the trustees would *Page 53 
have done well had they sold all of the holdings when they disposed of the 11,000 shares in 1932-1933. Viewing the action of the trustees in retaining the corporate stocks during this period in light of the world-wide financial depression and the uncertainty of the times; bearing in mind the fact that the stock was income-producing, we believe that the trustees were free of negligence in retaining these stocks and consequently that they should not be surcharged because of the decline in values."
This pronouncement was in line with previous decisions both of this court and of the Court of Errors and Appeals. People'sNational Bank, c., Pemberton v. Bichler, supra; In rePettigrew, 115 N.J. Eq. 401; Gates v. Plainfield Trust Co.,supra; In re Ward, 121 N.J. Eq. 555; affirmed, 121 N.J. Eq. 606; In re Cross, 117 N.J. Eq. 429. But it should be noted that in all of those cases the retention of the testator's investments was expressly authorized either by statute or by the will itself. In none of them was there any mandate such as that contained in the will here involved. There was no disobedience to the will of the testator. That is a distinguishing feature of In re Shaw,supra, mentioned by Mr. Justice Colie in his opinion in thePollack Case. And Vice-Chancellor Fielder himself in his opinion in the Pollack Case (23 N.J. Mis. R. 63, 75) made the same distinction. He there said:
"Pursuant to an Orphans Court rule then in effect, each account had annexed thereto a schedule or list of securities in which the estate was invested, the list showing trustees' book value of each security and such list in every account showed that the trustees still held the common stocks which had come to their hands as investments made by their testator. The rule of court * * * was promulgated by the Ordinary under authority of R.S.2:30-1 and it has been held that Orphans Court rules are as binding as the statutes (In re Sinovcic, 80 N.J. Eq. 260). It is said in reported and unreported cases in this state that notwithstanding the rule, such a statement is not a part of the account and that an Orphans Court decree approving an account does not carry with it approval of any investment shown in such statement, *Page 54 
in the absence of any issue raised before the court with respect to investments. It will be found that the investments involvedin those cases were such as were challenged as having been madecontrary to the direction of a testator's will, or as unlawfulinvestments, or as non-legals. In the instant case all common stocks were the testator's investments and came to the hands of the trustees as such. It was lawful for the trustees to continue such investments in the exercise of good faith and reasonable discretion. Comp. Stat. p. 2271 ¶ 34; R.S. 3:16-12." (Italics mine.)
His reference to reported and unreported cases obviously includes a reference to In re Shaw, a decision of the same Vice-Chancellor which was not criticised, but tacitly approved by the Court of Errors and Appeals in the Pollack Case, because of the distinguishing feature referred to. In the instant case, also, the investments are "challenged as having been made contrary to the direction of a testator's will." And it should be noted that, although no exceptions were taken to the executor's accounts, there was an almost immediate challenge to the trustees' first account — that account was filed November 16th, 1938, and the original bill in this cause was filed December 22d 1938. There was no such delay here as was present in the PollackCase; and because of the delay there, and many other distinguishing facts, the court may have concluded that the exceptant in that case had "deliberately" waived his legal rights. Cf. In re Oathout's Estate, 52 Atl. Rep. 2d 42.
But there is no evidence of waiver here, at least so far as thetrustees are concerned. However, the decision of the Court of Errors and Appeals in Pollack v. Bowman, supra, on the question of the conclusiveness of the decree, is conclusive on the question of the liability of the executors, as such, for losses resulting from their retention of the testator's investments up to the time of the decrees approving their accounts. To that extent these decrees are res adjudicata, and the executors, as such, are not now liable to surcharge for the losses resulting from retention of the testator's investments. The decision in Pollack v. Bowman applies to the instant case and must control my decision on this question, but the court's comment in that and the previous *Page 55 
decisions therein and herein referred to respecting the good faith and the exercise of reasonable discretion and judgment during the period of economic depression referred to in those opinions, does not, in my judgment, apply at all, because here there was an express mandate of the will which the executors deliberately ignored. Clapp, Wills and Administration in NewJersey, ¶ 296. There existed here "no possible field for the exercise of discretion on the part of the trustee" (Conover v.Guarantee Trust Co., supra), while in the other cases to which I have referred the trustees had discretionary power and were required only to exercise good faith and reasonable discretion. Nevertheless, these decrees are res adjudicata, as above stated.
The executors, in their first account, set forth a compromise settlement of the claim of Estelle Woodward Dickerson, the testator's widow, for certain of the assets listed in the inventory. Certain of those securities were turned over to her in settlement of her claim, the inventory value of which was $64,499.28, but the market value of which was $51,398.50 at the date of settlement. This was, in effect, a claim by the executors for an allowance for the inventory value of such securities and the decree of the Orphans Court approving that account is resadjudicata as to that item.
The executors also prayed allowance for losses as follows;
Note of Charles J. Smith ........................... $1,100.00
Sale of business of Woodward and Dickerson ......... 7,250.00
Notes of Edwin S. Dickerson ........................ 18,000.00
 __________
 Total ...................................... $26,350.00

The Orphans Court decree approving the account must be considered as an allowance for those losses, and it is resadjudicata.
In Schedule F of that account, entitled "Changes in Investments," no losses from inventory values are shown.
The final decree, entered January 19th, 1934, adjudged "in hands of accountant" $395,566.42, less commissions and counsel fees to be deducted therefrom, leaving a balance of $377,673.90. I assume the losses above scheduled and also *Page 56 
the amount of the compromise settlement with the widow, were deducted before that balance was determined.
Inspection of Schedule E of the executors' final account, entitled "Changes of Investment," shows that certain securities had been sold at a loss, as follows:
20 shares Tradesmen National Bank Trust Co., inventoried at $360 per share, or $7,200, sold at $177, or $3,531.40, entailing a loss of $3,668.60.
75 shares Merchantville Trust Co., inventoried at $12,187.50 — "total loss, bank closed."
$5,000 bond of Toledo Edison Co., inventoried at $5,237.50, sold at $5,091.75 — loss of $145.75.
$6,000 bonds of Interborough Rapid Transit Co. 6's, inventoried at $3,870, sold at $1,482 — loss of $2,387.40.
The final decree of the Orphans Court, entered June 29th, 1934, approving the executors' final account was an allowance of the executors' claim for losses thus sustained on these items, and isres adjudicata. This decree adjudged that there was "in the hands of said accountant the sum of Three Hundred and Thirty Thousand, five hundred sixty-seven dollars and twenty cents — ($330,567.20)" and after deducting commissions and counsel fees there remains $318,567.20 to be disposed of according to law. Again, I assume that the losses for which allowance was claimed were deducted before that balance was determined.
And that brings us to the question as to the extent of the liability of the trustees, if any, because of their acceptance from themselves as executors, of non-legal securities which they were not authorized to hold or retain. And first, as to the security value for which the trustees, as such, are accountable.
 III.
Counsel for the complainants contends that if a trustee accepts investments unauthorized by either the will or statute, he is liable for the value placed upon them by the executors in their account and cannot be allowed for depreciation prior or subsequent; that by such acceptance the trustee incurs this liability to make good the fund as a necessary consequence, *Page 57 
and that the trustee cannot lawfully accept from the executor an investment made by the testator or the executor which the trustee is not authorized to hold. In support of this latter proposition he cites Gates v. Plainfield Trust Co., 121 N.J. Eq. 460, 477,478, 484; affirmed, 122 N.J. Eq. 366; Macy v. MercantileTrust Co., 68 N.J. Eq. 235; In re Shaw, supra; In re Ward, supra;In re Brown, 112 N.J. Eq. 499. In Gates v. Plainfield TrustCo., supra (at p. 478), the following is quoted from 3Bogert, The Law of Trusts and Trustees 1836:
"`The trustee owes a duty to the cestui on taking over property from the executor to examine the property tendered and see whether it is that which he ought to receive. If the executor is under a duty to deliver money to the trustee, and tenders corporate stock in which the executor has wrongfully invested the funds of the estate, the trustee may render himself liable to thecestui by accepting such a tender. * * *'" (And at p. 2058) "`He must make up his mind whether the existing trust investments are legal or illegal, * * * judged by controlling trust clause.'"
Again, we should bear in mind that retention by an executor is tantamount to investment. Ashhurst v. Potter, supra.
In Macy v. Mercantile Trust Co., supra, Vice-Chancellor Emery held, if I understand his decision correctly, that the question of whether or not the executor is obliged to turn over cash to the trustee, or whether the trustee in accepting the assets of the estate from the hands of the executors is liable for the valuation put upon them by the executors if he does not insist upon cash being delivered to him, depends upon a construction of the will, and that the trustee can accept investments made by the testator, the retention of which was expressly authorized by the will or by statute; but that where the security taken is unauthorized, the trustee incurs a liability to make good the fund as a necessary consequence. In other words, where, under the terms of the will, the executor is directed to convert non-legal securities into legals, the trustee can accept from the executor only cash or legal securities, and if he accepts non-legals, he takes them at the valuation put upon them by the executor in his account. *Page 58 
In the instant case it must be borne in mind that the executors and the trustees were the same, and it would seem to me that the valuation put upon the securities by the executors cannot well be repudiated by the same persons as trustees. If, as trustees, they did not want to assume liability to account for that valuation, they should, as executors, have sought an allowance for depreciation in values by showing the then values in their account. This they did with respect to some securities sold at a loss as shown in the preceding section of this opinion, and by the decrees approving their accounts, allowances were made for such losses. With respect to retained investments of the testator they chose not to do this and thereby extended the time within which such retention could be challenged. However, so long as the securities, stocks, bonds, c., were carried at inventory value in the executors' account, the estate beneficiaries had a right to assume that such value was correct, and that the investments were entirely proper and that there existed no grounds for exceptions to the account.
In In re Ward, supra, Vice-Ordinary Bigelow (at p. 556), said:
"`The general rule is that the residuary legatee has a right to insist that before the end of the first year after testator's death, the executor shall, if possible, convert all the assets into money, pay the debts, funeral and testamentary expenses, and hand over the clear residue to the residuary legatee. 2 WilliamsEx. [*]1454. The legatee, residuary or other, may, however, in satisfaction of his legacy, consent to accept securities from the executors whether held by them for conversion under the general rule for settlement or under special directions of the will.'" But, "`The trustee has no right to accept, without inquiry as to the character and sufficiency of the alleged securities, anything but cash, unless under compulsion of a decree, or, in case of a testamentary trustee, because the assets in the hands of the executor were such as it was necessary or at least prudent so to do.'"
The Vice-Ordinary was there referring to a case in which the retention of investments was authorized by statute, and he held that the trustee might accept securities the retention *Page 59 
of which was authorized by statute or by the will. But, of course, that rule does not apply where the will contains an express direction to invest in legal securities. In such case it would seem that the trustee should insist upon the executors turning over cash or securities in which the trustee was authorized to invest, and that if he did not do so, but accepted unauthorized securities, he is liable to account for the value at which he received them. Van Houten v. Stevenson, 74 N.J. Eq. 1.
In that case, one of the issues, as stated in the syllabus, was:
"* * * whether the decrees of the Prerogative Court, made on the final account of the executors, and the intermediate account of the trustees, were adjudications to the effect that these securities were worth the appraised value contained in the official inventory, and that the undivided interest therein belonging to the trustees was then properly held by the trustees in the due performance of their duty and in the exercise of their sound discretion."
Vice-Chancellor Emery held that it was not such an adjudication as against persons other than the trustees, but that it was such an adjudication as against the trustees themselves. At p.12 of the report he said:
"The directions in this decree passing their final accounts, that the executors as trustees under the will take over from themselves as executors, and by way of distribution of the estate, the security in question * * * as payment or discharge of the balance coming to them as such trustees on distribution, istherefore no decree or adjudication as against persons other than the trustees interested in the estate — first, that the security was then of the value at which it was turned over or distributed to the trustees, or second, that the trustees were (as against other persons interested) authorized to accept it as assets realized and properly held in trust. The only effect of this recital in the decree is the effect derived from the fact that the trustees procured it, and that it operates as an admission on their part, that they received this security from themselves as executors, in the settlement of the estate, as assets of the estate realized to the full amount, without any claim for diminution or depreciation, * * *; and that *Page 60 
as trustees they received the same as representing, in their judgment, the value thereof, as stated in the accounting. Whether this action of the defendants as trustees, in accepting from themselves as executors this security as a full discharge of their duty in relation to the collection of the assets of the estate * * * binds them, * * * for the full amount so charged against them as taken over, it is not necessary now to decide. In my judgment, the taking over of the security to themselves as trustees in this manner for the full value thereof, makes them all prima facie liable for the entire amount, and until a rebate or allowance from this charge of the full amount has been made on proceedings directly and properly involving that issue, all of the trustees must, so far as the complainants are concerned, be held chargeable with the value at which it was taken over. Such question cannot properly arise until such rebate or allowance is claimed on an accounting as trustees."
(The underlined word "therefore" in the above quotation refers to the lack of jurisdiction of the Prerogative Court under the circumstances, to make a decree of distribution.)
And (at p. 10) the Vice-Chancellor said:
"The inventory charged all the executors prima facie with the appraised value of this debt as assets of the estate, and the continuance of this charge in the final account, without praying any allowance, made them all responsible (prima facie at least) for this amount as so much assets of the estate collected and in hand for distribution of the estate. In Weyman v. Thompson
(Court of Errors and Appeals, 1894), 52 N.J. Eq. 263, the question of the effect of a decree on the joint final account of executors was specially considered and decided, and the rule declared that the matters conclusively adjudicated by such decree are exclusively the receipt of assets and disbursements in behalf of the estate, and that the balance is in the hands of all or one of them."
I find no decree of distribution following the entry of the decree allowing the executors' final account in the files of the Orphans Court. That decree provided that the balance in the hands of the executors as shown by the account was "to be disposed of according to law." Of course, the law required *Page 61 
that that balance be delivered to the trustees and no further decree specifically directing the delivery of such balance to the trustees was necessary. It was already in their hands as executors, and after the decree they retained and held that "balance" as shown by the account as trustees. They are accountable for the assets received by them at the valuations at which they accepted them.
It is, therefore, unnecessary to fix any "arbitrary" date as of which these securities should have been sold and converted into cash as was done in People's National Bank, c., Pemberton v.Bichler, supra; Pollack v. Bowman, supra, and Beam v.Paterson Safe Deposit and Trust Co., supra. In the People'sNational Bank, c., Case a date, approximately nine months after the death of the testator, selected by the master was held to be "arbitrary." (As a matter of fact, it was not. Inspection of the record of that case before the master will show that the date so selected was in effect agreed upon by counsel for both parties.) In the Pollack Case the "closing date" of the trustees was selected, but that date was held to have "no firm basis in reason." In the Beam Case the appellate court held "the date fixed by the Vice-Chancellor cannot be justified." But here when the trustees accepted these securities at the valuations which they themselves, as executors, had fixed, market value as of any particular date ceased to be of any importance. Thereafter, the trustees could choose their own time for conversion because their liability was fixed, and if they chose to gamble on the future, they did so at their own risk.
 IV.
We now come to a consideration of the trustees' accounts, first and supplemental.
The first account of the trustees was filed in the Camden County Orphans Court on November 16th, 1938. The complainants acted promptly thereafter, and the bill in this cause was filed on December 22d 1938. The delay which characterized the PollackCase has no counterpart here. The account was removed to this court by order in this cause dated May 25th, 1939. On July 12th, 1939, exceptions to that *Page 62 
account were filed on behalf of the complainants. The "supplemental account" of the trustees was filed on September 5th, 1945, and exceptions to that account filed on October 2d 1945.
In Van Houten v. Stevenson, supra, Vice-Chancellor Emery said that the trustees were all prima facie liable for the value at which they received the estate assets "until a rebate or allowance from this charge of the full amount has been made on proceedings directly and properly involving that issue," and that, "such question cannot properly arise until such rebate or allowance is claimed on an accounting as trustees." As will appear from what follows, the suggested procedure has been adopted here and claims for such allowances are now made. These claims are, in my judgment, without merit. The trustees, by their acceptance of non-legal securities of the testator retained by the executors, not only assumed responsibility for their previous negligence as executors, but continued and prolonged the same negligent administration for over four years before filing their first account, 11 years before filing their supplemental account, and, from what appeared during the final hearings, are still so continuing. To grant these claims would exhibit a greater concern for the trustees than for their cestuis que trust, and this the court cannot do. Both are entitled to protection here, but we must not forget that the trustees are the fiduciaries with all that that word implies.
In the petition of the trustees attached to their first account they seek an allowance and approval of that account and their acceptance as trustees from themselves as executors, securities and assets of the estate in the amount of $318,711.19. They charge themselves with this amount plus additional principal of $9,348.19. They pray allowance for disbursements and losses on sales of securities amounting to $10,416.05 and show a balance of principal in their hands amounting to $317,643.33. Allowance is sought for losses sustained on nine sales or exchanges of securities listed in schedule B, amounting to $10,001.30.
All investments of the testator retained by the executors and taken over by the trustees and still in the trustees' hands *Page 63 
at the date of this account, are carried at inventory. For example:
282 shares of Chicago, Rock Island Pacific R.R. Co., 7% preferred stock, inventoried at $29,892, was carried in the account at that figure although at the date of the executors' final account the market was only $5 a share, or $1,410.
10 shares of Laurel Springs National Bank were carried at inventory value of $250 a share although the market value was then $30.
17 shares of Fidelity-Philadelphia Trust Co. stock was carried at inventory value of $600 a share although at that date the market was $300.
100 shares of Union Pacific R.R. Common was carried at inventory of $200 per share although the market was $121.50.
480 shares of Franklin Trust Co. was carried at inventory of $24,900 although on that date the stock was absolutely worthless.
Six exceptions were filed to this account as follows:
The first exception challenges the trustees' right to accept non-legal securities of the testator retained by the executors because the actual value thereof was much less than that shown by the executors' final account, and because the trustees should have demanded the full balance in cash or in legal securities of equal value; and also on the ground that the securities were non-legals which they had no right to accept, and that such acceptance constituted a breach of trust in violation of paragraph "Seventh" of the will. The exceptants seek to surcharge the trustees for the difference between actual value and the value stated in the account and also for losses or depreciation subsequent to such acceptance. The exception is sustained for reasons already stated.
The second exception is to the trustees' claim for allowance and approval of investments at inventory or cost value and seeks a like surcharge for depreciation in values. The exception is allowed for reasons already stated.
The third exception is to non-legals in the list of investments without naming them. It challenges the trustees' right to retain them and charges investment in non-legal securities without specifying what securities are claimed to be non-legals. Although rule 26 of the Orphans Court requires an exceptant to specifically state the item or items excepted to, I do not consider complainants' failure to strictly comply with *Page 64 
that rule as fatal because the exception is obviously directed to retained non-legal investments of the testator and not to investments of the executors and trustees, all of which latter, as the evidence shows, are legal investments. The reasons for the exception are fully stated and it is not difficult to determine the retained investments. Under this exception a surcharge for loss by reason of depreciation from inventory value and including 6% interest on the stated value of $318,711.19 is sought. The exception is sustained, except for the item of interest the rate of which, if any, will be determined after the amount of the surcharge is fixed and the income received is calculated, for reasons already stated.
The fourth exception is to the claim of the trustees for allowance for losses sustained on sale of certain securities as shown in schedule B. Under this exception a surcharge for such losses and 6% interest on the inventory value of the securities listed is sought. The exception is sustained, except as to the item for interest, for reasons already stated.
The fifth exception is to the acceptance and retention by the trustees of non-legal securities and seeks a surcharge for losses by depreciation and 6% interest on the total value of assets as shown by the executors' final account, less income actually received. This exception, aside from the item of interest, is included in the first exception which has been sustained. The item of interest will abide the decision on a like item in the third and fourth exceptions.
The sixth exception opposes any allowance of commissions and counsel fees on the grounds of breach of trust and bad faith in management, acceptance of non-legal securities contrary to law and the terms of the trust, and seeks a surcharge for losses in principal and income. Decision on this exception is reserved until the actual amount of the estate losses and the amount of the surcharge allowed on previous exceptions is determined.
The Supplemental Account differs from the preceding accounts of both executors and trustees in that it shows the assets presently in the hands of the trustees, the appraised or inventory value of the decedent's investments, the cost of other assets acquired by the trustees, and the estimated market *Page 65 
value of all assets as of July 27th, 1945. By their petition the trustees seek the approval of their entire administration "purchase, sale, exchange, liquidation and retention of assets" and receipts and disbursements, and ask a review of the trustees' administration. They charge themselves with the balance shown by the previous account, viz., $317,643.33, and additional principal receipts of $60,713.58, or a total of $378,356.91. They pray allowance for principal disbursements of $64,393.41 and show a balance of $313,963.50 in their hands. The statement of inventory and market values as of July 27th, 1945, is as follows:
 Asset Cost or Inventory Market
Bonds ............................ $155,864.93 $162,560.81
Stocks ........................... 88,515.25 52,900.25
Mortgages ........................ 17,613.05 17,613.05
Real Estate ...................... 50,987.85 50,987.85
 (Other items shown at inventory.)

This statement shows a gain on bonds of $6,695.88. It shows a loss on stocks of $35,615. The gain on bonds is claimed as an offset against losses on stocks. Four exceptions are filed to this account as follows:
The first exception is to the retention of non-legal securities, without naming them, and seeks a surcharge for depreciation and loss of income at 6%. The exception is sustained except for the item of interest in line with my disposal of similar exceptions to the first account.
The second exception challenges allowance claimed for losses on sales of retained securities, without naming them, but listed in schedule A attached to the exceptions and consisting of eleven items showing losses of $53,599.35. The exception is sustained for reasons already stated.
The third exception is inclusive of the second, and is also to allowances claimed for losses on securities in schedule B attached to the exceptions, and seeks a surcharge for loss of income at 6% on inventory values less the amount of income actually received. The exception is sustained except as to the item of interest.
The fourth exception challenges any allowance for commissions and counsel fees because of breach of trust, bad management *Page 66 
and acceptance by the trustees of non-legal securities. Decision on this exception is reserved in line with my disposition of the sixth exception to the first account.
At the conclusion of the final hearing I requested counsel to make up for me a statement showing the inventory value, the market value as of July 27th, 1945, and the market value as of the date of the statement, of testator's investments still retained by the trustees. That statement was made up as of February 13th, 1946, but it includes not only the retained investments of the testator but also all securities then held by the trustees, both retained investments of the testator and investments by the trustees. It shows those values as follows:
Inventory value ................................. $280,307.70
Market value July 27, 1945 ...................... 222,649.87
Market value February 13, 1946 .................. 257,486.58

I have endeavored to analyze this statement and segregate the testator's investments still retained by the trustees, and from that analysis I find that the values of such retained investments as of the dates mentioned are as follows:
Inventory value ................................. $130,057.46
Market value July 27, 1945 ...................... 81,933.97
Market value February 13, 1946 .................. 92,475.97

These figures include mortgages, real estate owned by the testator or acquired by the executors and trustees through foreclosure, and household goods, which are still carried at inventory. The above figures show a loss from inventory of $37,500 as of February 13th, 1946, and a recovery of about $10,500 since July 27th, 1945, the date of the trustees' supplemental account. There may have been a further recovery since the date of this statement and, if so, the loss stated will be reduced accordingly. The figures are inserted here for the convenience of the court and of counsel in calculating the losses sustained and the amount of the surcharge against the trustees. Counsel will at the earliest possible moment present to me the results of their calculations and from them I will determine the amount of the surcharge, or, counsel may, if they can, agree upon such amount. *Page 67 
By an order of this court advised on October 18th, 1945, the trustees' accounts were referred to a master in Chancery for audit. His report was filed on May 18th, 1946, and shows the accounts to be mathematically correct, but he calls attention to some slight irregularities, which have been corrected, some changes in investments resulting from the sale of securities, foreclosure of mortgages and subsequent sale of real estate, between the date of the account and the audit, duplicate charges amounting to $19.15 and improper apportionment of income andcorpus between life tenants and remaindermen with respect to the proceeds of the sale of real estate. The master has restated the principal and income accounts to reflect the proper apportionment of these items and as a result thereof the balance of principal as corrected is shown to be $311,231.71 instead of $313,963.50 as stated in the supplemental account, and the balance of income, as corrected, is shown to be $3,021.62 instead of $270.68 as shown in that account.
I will advise a decree in accordance with the foregoing conclusions.
In reaching these conclusions I have disregarded the fact that two of the complainants, Elizabeth W. Dickerson and Adrian S. Dickerson, are infants, and that the latter was not born until 1937, about three years after the executors' final account was filed. I deemed it unnecessary to consider the rights of these infants as distinguished from those of the adult complainants because the relief afforded to the adults by virtue of my decision inures to the benefit of the infants in full measure and accords to them every right to which they are entitled. Aside from this, the rights of the infants as distinguished from those of the adults are nowhere mentioned in the briefs of counsel for any of the parties. *Page 68